I hope I've got that right. Case number 24567. And I thank both counsel for appearing for oral argument. Thank you. May it please the court. Susan Kelman for Vizcapa Perera, which took me quite a while to learn to say. Good afternoon, your honors. I will address myself first, I think, to the gossip issue since the court seemed to raise that at the last moment. But I think it's an easy enough issue because I don't think that the decision in gossip changes the Nat Peewee standard in any way. I think that it maybe is simply an extremely articulate reminder that the government has certain obligations that it can't hand off to a defendant. Here, I think that, well, here it's our contention that the main witness for the government, which was an IRS agent who had retired but had supervised the active agent on the case, that that agent gave false testimony. The government denies that they gave false testimony, but in addition to our argument that that witness testified falsely, the government, under both NEPU and gossip, of course, has an obligation to correct erroneous testimony, and they failed to do that. And it's that that I think we focus on considerably in our briefs. The test, I believe, we could say is two-pronged, which is the false testimony and the failure to correct the false testimony. So would you focus on the first prong? In other words, why is the testimony that you point us to actually false, as opposed to testimony that answers questions and that could have been subject to cross-examination by way of follow-up but was not followed up on? So what is it about his testimony, the supervisor's testimony, that was actually false? Well, for one, actually false, although I think it's less important, is the fact that she had family members who were ill or suffering from some kind of illness, which I think there's nothing to that effect in the record at all, but I think that's less of an issue. He said, essentially, that she had personal problems but didn't develop the personal problems beyond that. Of course, what matters to this Court and under these cases is the fact that the personal matters, if they in any manner, shape, or form, would affect the timeliness or accuracy of the reporting, that that's what's critical to the Court. And here, just saying that she had personal... So was the theory that that was a failure to disclose or a false representation or a half-truth? What is the theory? I think a misrepresentation and a half-truth. In other words, in terms of, let's put timeliness aside for the moment, but just in terms of accuracy, I think that had the jury known that this witness was under criminal investigation at the time for a 1001 violation, and in terms of timeliness, for cheating and stealing time from the IRS by masking the fact that she was taking sick time in order to gamble, yeah, that's a personal problem, but I think that's really an understatement or a misrepresentation of what a personal problem could be. So did she have the report? I'm sorry, she, the witness? No, no, no, no. The defendant? The defendant. Yes, of course she did, yeah. She did. So she had access to the information? Yes, that was part of the record. The witness testified, agent, retired agent Smith testified extensively about what was, about the content of that report. But he didn't write it, and he had nothing to do with writing it. It was somebody that he supervised who wrote it, and it was somebody he supervised who did not appear in court. And the suggestion was that she had some kind of personal problems, but in fact, she had been under criminal investigation in the Southern District of New York and in the Eastern District of Pennsylvania. Well, those are personal problems. Well, they're also, I think that you could say that they're a misstatement to the effect that they were, to the extent that there were 1,001 violation and perjury inquiries in Goda. Truthfully- That goes to my follow-up question. I think I understand what you're saying, but you're accusing, first of all, is it Inspector Smith, of falsely testifying. And then, of course, you're saying, you're arguing that the government understood that what they had elicited was false testimony. But it all rests on the idea that he was required to disclose everything. Well, I think- In some jurisdictions, a cooperating witness is not required to disclose everything about what he or she did by way of engaging in criminal activity. And personal problems is not false. Well, I think that personal problems could be a splinter, you know, could be a broken bone, or it could be being under criminal investigation for lying to your employer or cheating your employer out of time. And I think that to the extent that, yes, you may be right, you are correct, Judge, that personal problems covers an awful lot of territory. But when the government knows that those personal problems, such as they are, involve lying to their employer, falsifying documents in order to be able to gamble so that she doesn't have to go to work, taking money she wasn't entitled to because- How much of this has to do with the fact that the defendant was pro se, with standby counsel, but was pro se? I don't think any of it, Your Honor. I really don't. I mean, I really don't. You know, even the government's argument with respect to the fact that the prior counsel had been notified about this difficulty, and they assumed that she knew, and she didn't know. Well, I was standby counsel. I didn't know either. And the reason I didn't know was I went and I checked the docket, and there was a discovery letter, only one, and that discovery letter laid out the discovery, and I went through all the discovery myself and with the pro se defendant. But there was nothing in there that would suggest that the prior counsel got an email that is nowhere reflected in the docket. So how would she have known? I didn't know, and the government just casually mentioned it to me during deliberations. So what would you or your client, what would they have been able to do with this? Had it been disclosed earlier or more overtly? Well, I think that her credibility would have been, it would have been- She was a witness, right? So exactly what would you do? You'd be crossing Smith about statements Smith made about Coleman or what? Well, if she said, if he testified that nothing that she did would affect her accuracy, it would seem to me that a valid cross-examination would be, did you know that she was under investigation while you were supervising her? Did you know she was under investigation for lying, for cheating, for stealing? And it would seem to me this was the only evidence essentially against the defendant. But is it clear that the answers to those questions would have been yes as opposed to no? I think they'd have to be yes if he was being truthful. But they were covered up so that nobody knew. And I think that that is, I mean, we could say that that's, I don't know how that's not a significant misrepresentation of who this agent was and what her shortcomings were. Because somebody, I mean, if I'm cross-examining a witness who's on the stand who's lied to her employer, who's a government agency and stolen money from her employer and is under criminal investigation. So the central issue, at least with respect to Coleman, was whether a visit had occurred the day before that might have explained the defendant's behavior, right? Well, I think it may be a little bit broader, and that is what was in the report, whether or not it could be relied upon. Because the person who wrote it was somebody who had the pro se defendant known, but of course examined her about her accuracy. As I understand it, but maybe I'm wrong. Maybe I should put it this way. One of the central issues was whether Coleman had visited your client, correct? Correct. Okay. And that might have explained her motivation and so on to engage in the conduct with which she was charged. Is that also right? To an extent. It wasn't just whether or not she visited her, but if she had visited her, what she said. Because what she said, what the agent put in the report with a reputation that she, if the jury had known that she was not a truth teller or she was being charged with- Was there any real dispute that if she did visit her, she announced at least that she was an IRS agent? Again, Your Honor, we don't know what happened because we never heard from the agent. Is it right that your client during closing acknowledged that Coleman visited her? That's correct, Your Honor. Okay. The government's brief says because Smith retired in 2018, he could not have known about either the 2020 TICTA report or the sick leave misuse it found. Are you disagreeing with that? You're saying that's an inaccurate statement? I'm saying that it doesn't really matter, Your Honor, and the reason it doesn't matter is because the government knew. If Smith didn't know about it, how would he have answered yes to the questions that you suggested should have been asked on cross? But under NEPU and also GLOSSIP, the government has an obligation to correct an erroneous record. Whether he knew or he didn't know, and I find it hard to imagine that when you're putting a witness on the stand, you know better than I do about preparing witnesses as prosecutors, but I can't imagine that the conversation didn't come up so that the answer, personal problems, was very carefully constructed so that the question Your Honor asked is valid. Doesn't that cover a lot of territory, but does it really cover criminal investigations in the Southern and Eastern District, and doesn't that affect our credibility? You reserved a couple of minutes of rebuttal. I did. We'll hear from the government. Thank you. And thank you. Thank you for your last-minute travels. No problem, Your Honor. May it please the Court, Hannah Cook for the United States. I want to address a few of the points Your Honors have brought up, but I first want to talk about something that we haven't heard about either this morning or in any of defendant's briefing, which is that we're really talking about only one count. We're talking about count three, the 7212A conviction for obstruction of the IRS, and there are two factual predicates that are completely independent for count three. One of them, which is what we've been talking about here today, is moving the money. Defendant moved assets out of multiple bank accounts that were in her name into the name of a trust, making it harder for the IRS to collect. And to Your Honor's point, one piece of evidence as to that charge was this ICS history entry made by Revenue Officer Coleman, documenting that the day before the defendant moved the money, Coleman had gone to defendant's house and spoken with her and indicated that the refunds needed to be returned and that she could be subject to levy if they were not. But there's an entire second independent factual predicate, which is that in 2021, IRS special agents, different agents actually from a different side of the house from the IRS, and the testifying witness was Kashima Popo, they visited defendant and they gave her a target letter and said, you're under criminal investigation for these fraudulent refunds. And less than a month later, she mailed a false check purporting to draw on the Royal Bank of the United States, which for obvious reasons does not exist, for a million dollars purporting to pay her tax liability. And I've never heard any reason that the count doesn't stand entirely independently on that ground. That evidence came in through, as I said, Ms. Popo. So there is a way of reading Glossop in that way to say that if the government intentionally procures false testimony by a witness, then it's an automatic reversal. And you're saying, well, there's a harmlessness argument there, I think. I think I'm saying there's a materiality argument there, because Glossop is not analogous to this case, because in Glossop, there's one charge, one theory and functionally one witness, right? It's the testifying witness who's the person who actually murdered the victim in Glossop. And it's that witness's testimony in Glossop who is saying, I, you know, he told me to do it. He convinced me we were in this together. And that was meaningfully some of the only evidence directly connecting Glossop to the murder, was the testimony of this other individual, Sneed, who had pled guilty, I believe, in exchange for not receiving the death penalty. So there was no alternative factual basis. But am I right that with respect to materiality, that's the government's burden? I think that certainly the government— Isn't that what Glossop says? Glossop says that once we are looking at the impact that it had on the jury's verdict, the government has the burden, yes. And I would contend that, although I don't think we need to get there for numerous reasons that I'd like to address, the government's met that burden here, because what the government has shown is that there is independent evidence from Special Agent Calcione and Special Agent Popo about a completely different episode, a completely different set of facts, which no one's ever disputed the accuracy of. And I think if Your Honors look back at the trial transcript, you'll see it's very convincing evidence. So I think that's sort of the end of the analysis. But I'd like to go back to the beginning of the analysis and talk about falsity and misleadingness. So as Your Honors know, this testimony was not false. For the first time today, I heard counsel say that the testimony was false because it referenced an ill family member. And as the government pointed out in its Glossop brief, in a footnote, there are multiple references in the discovery to Ms. Coleman's mother being ill and Ms. Coleman being the primary caregiver. I'm happy to provide that. I actually have the full report. Only a small segment was attached in the district court. But I'm happy to provide it either under seal after this proceeding or in paper right now. So I don't think that there's any reason to believe that that was false. And it is defendant's burden to prove falsity. And once having dealt with that, I think the issue is that this was not misleading, because as Judge Sullivan noted, this witness is testifying to what he knows. He supervised the defendant ending in 2018 with his retirement, at which point there was no way he could have known. So as I understand it, though, the object is not to look at what the witness believed. The burden is entirely on the government that's eliciting the testimony. So if the witness could believe X, Y, and Z, but if the government knows that X, Y, and Z is false, that becomes a problem under Napoleon Glossop. Is that right or is that wrong? If the government knows it's false and if it's on direct, if the government elicits it, if it's part of the government's case, yes, the government has an obligation to correct. Regardless of what the witness believes or doesn't believe. Is that right? I think in most circumstances, yes. I think there's, you know, yes, you need to correct the testimony, but here there was nothing false. What he testified to on direct were two very specific things. Was he aware of some personal issues? Yes. Did they affect the accuracy or timeliness of her ICS history reports? That was a very specific question, which is this reporting system that Smith was later going to read out of that documented basically their case-related activities. And he said no. But even including the testimony that he said on cross when asked, what was his understanding of those personal problems, the fact that she had financial problems, she was taking a hardship withdrawal out of her thrift savings plan to fund her gambling, she was taking a loan from a former co-worker, and she had this ill family member and was taking sick leave. All of that is true. What was his response to that question, by the way? Let me get the full. So what he said, and it's in our glossary brief, but let me pull it up so that I can read it, because this is why I put this in here, is what he said is she had, quote, some financial difficulties and she had a family member particularly with extensive health issues that, you know, occupied her time as well. That's in Appendix 69. So that's what he says. And then defendant moved on. And I think it bears noting to the extent that often these inquiries do sort of focus on the prosecutor's knowledge. The prosecutor's good faith belief, given that they had turned over this evidence to the defense, they had turned over the TIGTA report, they had identified it as impeachment, I mean, quite frankly, the question that was asked on direct was a pretty classic drawing the sting question, given that both defendants had, at the Feretta hearing, confirmed that she had received the discovery. And I'd like to note that Mr. Pays, the attorney from Debevoise who was representing her from the CJA panel, said at what would have been change of plea and turned into a Feretta hearing, and that's at docket, let me make sure I've got this right, 35, page 15. Defendant Caterpillar asked, how am I going to get the discovery? And Mr. Pays represented to the government and the court that he was going to provide it to her. So then, of course, when she next appeared for her next Feretta hearing, the court asked, did you get the discovery from your prior counsel? She said yes. The district court put it out and formalized it on the docket. Defendant received the discovery. So, I mean, the government thought that she had this evidence. And, indeed, there's been no representation from Ms. Caterpillar as to whether she actually received it. The government wasn't involved in the transfer of the files between Mr. Pays and Defendant Caterpillar. So the record is just that we gave it to him when he was her representative. She said she got it. That's sort of all the government has daylight on. But, I mean, I think. What is your response? I think I've got your argument. Yeah. What is your response to this argument that he should have said more? In other words, he knew, potentially knew more about the nature of these personal problems. He should have said more and not as an obligation on his part, but the government, knowing that the personal problems were of a particular nature that would go directly to her, potentially go directly to Coleman's credibility, although there's not a confrontation clause challenge here, should have either said something at the time or cleaned it up after the cross-examination. I think that what matters is both. I don't think this witness had. There's nothing in the record to suggest that this witness had the knowledge to be able to clean that up, as Judge Sullivan suggested someone could have asked. The government did. But even if the government. I agree with you. The government did know about her sick leave misuse. But much as I know my friend on the other side likes to say that this was a criminal investigation, she was never convicted of any crime. This was using leave for an inappropriate purpose. She should have taken annual leave to do this. But I think, and I think the courts, I think it's Mills in this case, goes to this, where when it's not an outright falsity, where it's a matter of how much does a witness say and how much do you get into it, the government's put in a pretty difficult position in terms of potentially stepping on the defense. If we go forward and we try to clarify cross-examination questions, we try to get expanded answers, because we don't know what the defense strategy is going to say. No, I mean, what's an unfortunate feature of this, just a feature of this, fortunate or unfortunate, is that we have a pro se litigant defending herself. And I think that's a big part of it. I think if she had been represented, obviously counsel would have used this evidence differently. I mean, I don't think she used any of the exhibits from any of the discovery. She asked good questions. I mean, if you look at the transcript, you know, the defendant asked really good cross-examination questions, sort of in response to things people had said. But she's not a trained lawyer, and I don't know to what extent she knows about, you know, various methods. And she had the Coleman Report, or at least that's. From the best. We disclosed it to Mr. Pays when he was her counsel, and both Mr. Pays and Ms. Caraparra represented that they would give and then had received the discovery. So, I mean, that's kind of all I can, you know, that's kind of all we can do in that situation to the extent that Mr. Pays erred and somehow omitted the report. That's, I mean, that's not a ground the government can weigh in on. We don't know. Thank you very much. Thank you. That would be a potential and effective assistance of counsel claim down the road, presumably. Yes, there could be fact finding as to whether or not it was disclosed, and we could get into various, you know, whether it's material for various reasons. But, yeah, that would require fact finding beyond my ken. Thank you. I would ask you to affirm. Thank you very much. Briefly, Your Honor. On direct examination, the witness was specifically asked. Where is this? It's actually in the government's brief on page two of their, page three of their glossary brief. Okay. The witness was asked, did these personal issues cause any difficulty with respect to timeliness or accuracy of the report, essentially? And the suggestion that the government didn't have an obligation to correct that answer, his answer was no. It didn't affect her timeliness, nothing about timeliness or accuracy. How does the government say with a straight face that there's no reason to doubt the accuracy of her report when they know, they know, that she was, they say, oh, not filling out her paperwork right. She was stealing from the government. She was lying about sick leave. These aren't contested issues. She was lying about sick leave so that she could gamble. She was gambling. What was the question and answer again? The question was, did these personal issues cause any difficulty with respect to the timeliness or accuracy of Coleman's ICS history entries? And the suggestion that we can rely on the entries that she made, given the fact that she was being investigated in two different federal districts for lying, one for perjury and the other one for a 1001 violation, it seems to me, should have put the burden, which is not a gray area, on the government to bring out the fact that this wasn't accurate. I mean, what is not accurate? I mean, is there something in the record to indicate that there were both timeliness and accuracy problems? Well, the accuracy certainly, she wasn't being, I mean, we don't know whether or not the report is accurate, but we do know that she's capable of not being accurate because she was lying. I mean, think of the cross-examination. If you know that she's lied to her employer, that she's stealing money from her employer, that has to diminish the credibility of her accuracy, of her representation, that what she's done is accurate. More importantly, Judge. I mean, you're suggesting that there was a difficulty with respect to timeliness and accuracy. Yes, Your Honor. And that seems speculative. In other words, if there really was clearly documented evidence that these were late, they were routinely done late, or there are blundering errors in them, then that would be a false statement. The answer to that question that you just posed would be a false statement. But there's nothing in the record that says that, is there? But, Your Honor, both of these, because of her conduct, both of these issues were, I mean, these issues were referred to two different federal courts and two different investigative agencies. And the government failed to even let the district court know that she, in fact, was the supervising agent, the supervising United States attorney, who was supervising the investigation of this IRS agent. They used a fake name. They used an alias. And they say, well, that was to protect the witness. But they'd have to protect the witness from the judge. They never told the district court judge that she was investigating this person. Just to go back to Napoi and Glossett for a moment. If it's ambiguous whether or not the testimony is false, this goes to something you said about the timeliness and accuracy. Then does that trigger an obligation on the part of the government? Your Honor, I think that is exactly the right question to ask. And the answer is yes, it does. Because the United States. Even if it's ambiguous. I think. The way that I read, but I, you know, I misread decisions all the time, I'm sure. The way that I read those two decisions and other decisions is that it's got to be clearly false. And that triggers the government's burden. Well, in my view, Your Honor, the government knew it was clearly false. And they don't deny in a way that. How is it clearly false? I mean, you keep suggesting this would be great impeachment. And you're right. But where is the clear falsity in the answer to that question about timeliness and accuracy? Well, there are records. Is there any inaccuracy that's not? There are records, employment records, that resulted in the referral to the United States Attorney. No, I know that. But is there something about these reports that was conceded to be inaccurate or untimely? Well, I think that the answer to that, Judge, is we don't know the answer. And we don't know the answer because we never heard from that witness. All this agent did was read the report. So we don't know whether or not they're accurate or they're not. But we do know that the author is not a reliable reporter. We do know that there are reasons to question the reporter's accuracy. And since we didn't hear from the reporter, the agent here, we have to ask ourselves whether or not there's reason to think that she was accurate, that her reporting is accurate. Thank you. Thank you very much. Okay. Thank you. I think we've got the arguments well in hand. Thank you again both for appearing for argument.  We'll reserve decision.